In re John Gill CHRISTISON, Debtor.

Stephanie CHRISTISON, individually and as Guardian for Jacquelyn Marie Christison, and Jack Devin Christison, Plaintiffs,

v.

John Gill CHRISTISON, Defendant.

Bankruptcy No. 95–01195–6J7.
Adv. No. 95–154.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

March 8, 1996.

Richard A. Robinson, Orlando, Florida, for Plaintiffs.

Richard B. Webber, II, Orlando, Florida, for Defendant.

*FINDINGS OF FACT AND CONCLU-SIONS OF LAW ON AMENDED COMPLAINT TO DETERMINE DIS-CHARGEABILITY OF DEBT*

KAREN S. JENNEMANN, Bankruptcy Judge.

This adversary proceeding came on for final evidentiary hearing on November 2 and 3, 1995, on the Amended Complaint of Stephanie Christison ("Plaintiff"), individually and as guardian for her two children, Jacquelyn Marie Christison, and Jack Devin Christison, to determine the dischargeability of certain debts (the "Complaint") (Doc. No. 8). Specifically, Plaintiff seeks to except from the discharge of the debtor/defendant, John Gill Christison ("Debtor")[1], monetary obligations imposed in the dissolution of marriage between Plaintiff and Debtor pursuant to Sections 523(a)(5) and 523(a)(15) of Title 11 of the United States Code (the "Bankruptcy Code").

*Introduction.* The facts of this case demonstrate the extreme financial difficulties people often encounter after a divorce. Here, the Parties married young, had two children, and founded what became a very successful landscaping business. After enjoying many years of financial success, the Parties agreed to divorce and negotiated a consensual agreement resolving all open issues.

Unfortunately, since the divorce, both Parties have suffered a significant financial decline. The businesses which operated successfully during the marriage have failed or are in a declining financial condition. Neither the Plaintiff nor the Debtor have sufficiently reduced their expenses to accommodate their reduced incomes. Given this bleak financial picture, the issue squarely presented is whether the Debtor should have any continuing child support obligations under Section 523(a)(5) of the Bankruptcy Code and whether he has any further indemnification obligations to the Plaintiff under their property settlement agreement pursuant to Section 523(a)(15) of the Bankruptcy Code.

*Marriage and Creation of HLS.* Plaintiff and Debtor were married on December 30, 1972. Two children were born during the marriage: Jack Devin Christison ("Devin") on February 28, 1975, and Jacquelyn Marie Christison ("Jacquelyn")[2] on May 18, 1981 (Plaintiff's Exhibit 1). Early in the marriage, the Parties operated a landscaping business in Texas known as Houston Landscape Systems, Inc. ("HLS"). HLS was successful, and the Parties expanded their operations throughout the southeastern United States by forming subsidiaries (the "Subsidiaries") each using a variation of the "HLS" name. For example, HLS–Florida Landscape Systems, Inc. ("HLS Florida") was created when HLS obtained a large landscaping contract in Florida.

*Stewart Litigation.* In connection with the landscaping businesses and at the request of the Parties, Southern American Insurance Company ("Southern") issued a performance bond (the "Bond") in connection with certain work undertaken by HLS or its subsidiaries. Both the Plaintiff and the Debtor individually indemnified Southern for any amounts it would pay under the Bond.

In connection with one of HLS Florida's landscaping projects, Stewart Iron Works Company, Inc. ("Stewart") sued HLS and Southern for the failure of HLS to pay subcontractors and suppliers (the "Stewart Litigation"). On December 2, 1993, Stewart obtained a judgment against HLS in the amount of $203,217.99 (the "Stewart Judgment") (Plaintiff's Exhibit 23). Subsequently, Southern sued Plaintiff and Debtor for indemnification provided in connection with the issuance of the Bond (the "Southern Litigation") (Plaintiff's Exhibit 24). This suit is still pending and, at this time, no judgment

[1]. Debtor and Plaintiff are sometimes collectively referred to as the "Parties."

[2]. Devin and Jacquelyn are sometimes collectively referred to as the "Children."

has been entered against the Plaintiff individually.

*Divorce.* On June 8, 1993, a Final Consent Decree of Divorce and Judgment (the "Divorce Decree") (Plaintiff's Exhibit 1) was entered in the District Court of Harris County, Texas, dissolving the Parties' marriage. On May 28, 1993, the Parties also had entered into an Agreement of Distribution of Stock of Controlled Corporations (the "Agreement") (Plaintiff's Exhibit 1). The terms of the Agreement were incorporated into the Divorce Decree.

In the Agreement, the Parties divided the various HLS Subsidiaries between them so that Plaintiff would retain HLS and its Texas operations and Debtor would retain HLS Florida and its related operations. The Agreement also provides for cross-indemnifications between Plaintiff and Debtor for various obligations incurred by the Subsidiaries retained by each of the Parties (Section 12.6 of the Agreement). Specifically, pursuant to Section 12.6(f) of the Agreement, Debtor agreed to indemnify Plaintiff for any liability, judgments or costs associated with the Stewart Litigation or the lawsuit brought by Southern. The Agreement also provides indemnification to the prevailing party for "its reasonable expenses, court costs and reasonable attorney's fees" incurred in the enforcement of the Agreement (Section 13.7).

In addition to dividing the Parties' business operations and assets, the consensual Divorce Decree requires the Debtor to pay child support and post-secondary school obligations for Jacquelyn (Section 11.1 to 11.13 and 11.15) and post-secondary school support obligations for Devin (Section 11.14). At trial, the Parties stipulated that the Debtor's support obligations imposed under paragraph 11 of the Divorce Decree with respect to Jacquelyn are nondischargeable, whether past due or to accrue in the future. Further, they agreed that any amounts due and owing for Jacquelyn's support will be determined by the state court in Texas.

Section 11.17 of the Divorce Decree requires each of the Parties to pay one-half of the premiums on two $1 million life insurance policies on Debtor's life which are held as assets of a family trust (the "Family Trust"). Debtor acknowledges that he owes $15,527.52 in connection with this obligation and that this debt is nondischargeable.

The Parties disagreed as to the dischargeability of Debtors' continuing obligations to Devin. Section 11.14 of the Divorce Decree requires each of the Parties to contribute 50% towards Devin's post-secondary education until he reaches age 25, up to a maximum of $10,000 per year. This obligation is contingent upon Devin's enrollment as a full-time student and his maintaining a "C" average.[3] The Parties also are required to each contribute one-half of the cost of medical insurance for Devin as long as Devin is actually "enrolled in and attending school" (Divorce Decree, Section 11.4 c.)[4], regardless of performance, until August 25, 1997.

*Devin's College Attendance.* In the fall of 1993, Devin matriculated at Louisiana State University. He failed to maintain the required grade average, however, and was placed on academic probation. Devin enrolled but failed to successfully complete the Spring 1994 term. He thereafter returned to Houston and once again failed to complete the Fall 1994 term at the University of Houston. He plans to return to college in the spring of 1996. Although Plaintiff contends that Devin's poor performance is attributable to a previously undiagnosed attention deficit disorder, the Divorce Decree does not provide a medical exception to the Debtor's obligation to pay Devin's college expenses for a child having failed to meet the minimum grade requirement.

Plaintiff seeks reimbursement from Debtor of more than $40,000 (the "College Expenses") for Devin's college expenses which includes $19,000 for the purchase of an automobile. Plaintiff previously received a tax refund check totalling $7,326 which under

---

**3.** Similar provisions apply to Jacquelyn following high school graduation (Agreement, Section 11.15).

**4.** Slightly different provisions apply to Jacquelyn. Insurance for Jacquelyn is contingent upon the Parties' responsibility for contributions toward post-secondary education which is determined by her performance in school.

Section 12.2 of the Divorce Decree was to be split equally between the Parties. Therefore, by allocating Debtor's portion of this tax return to pay the College Expenses, Debtor has paid at least $3,663 of his obligations to fund Devin's College Expenses. Debtor further testified that he had paid additional amounts requested by the Plaintiff for the College Expenses. However, no credible evidence was introduced to support the debtor's testimony. For example, he introduced no checks demonstrating he made any such payments.

*Remarriage.* Shortly after the divorce, Debtor married Leslie Christison ("Leslie"). They have one child, born November 19, 1994. Leslie is a registered nurse with an annual salary of $54,700 (Plaintiff's Exhibit 29).

*Bankruptcies.* In March, 1994, HLS Florida filed a Chapter 7 bankruptcy case. In 1995, HLS filed its own Chapter 7 case in Texas. On March 14, 1995 (the "Petition Date"), Debtor filed his petition under Chapter 7 of the Bankruptcy Code (Main Case Doc. No. 1). On August 21, 1995, an Order of Discharge was entered (Main Case Doc. No. 30).

*Debtor's Assets.* Five months after the Petition Date, on August 31, 1995, Debtor and Leslie purchased a new home at a cost of $225,000. The down payment was obtained from the Debtor's exempt retirement accounts and the balance represented by a mortgage loan of $196,305 (Plaintiff's Exhibits 30, 31 and 32). Leslie leases a 1995 model luxury car with payments of $459 per month (Plaintiff's Exhibit 33). Debtor drives a company vehicle and has no other substantial assets.

*Debtor's Employment.* At a deposition held October 24, 1995, and at trial, Debtor testified that he was employed by D & D Tree Farm and Nursery, Inc. ("D & D") at an annual salary of $60,000, plus anticipated bonuses. In fact, as a result of post-trial discovery [5], it was shown that, prior to the Debtor's first deposition, on October 14, 1995, Debtor had accepted a position at Hedor Development Company ("Hedor") and that he had resigned from D & D on October 20, 1995. Debtor began employment with Hedor on November 6, 1995, immediately following the trial in this adversary proceeding.

Debtor's salary at Hedor is substantially more than he received at D & D. He is paid $85,000 per year plus bonuses which are expected to be substantial (the "New Salary"). In addition, Debtor receives a company car, telephone, reimbursement of travel expenses and health insurance. Gross income for the couple (before any bonuses attributable to Debtor's work) totals $139,700.

After reviewing Debtor's trial testimony and the transcript of the post-trial deposition, the Debtor clearly intended to deceive both the Plaintiff and the Court regarding his employment and his expected increase in income. Further, the Debtor's testimony on other key issues was less than forthright. As such, Debtor's testimony is suspect and generally lacks credibility.

*Debtor's Expenses.* Debtor's projected monthly expenses with his wife Leslie exceed their combined incomes even taking into consideration the New Salary (Plaintiff's Exhibit 35). However, given the suspect nature of the Debtor's candor and truthfulness, the Court gives little credence to the Debtor's list of expected expenses. Many of the projected expenses are facially unreasonable in amount [6] or represent amounts for loans no

**5.** At the completion of evidence, a hearing was scheduled to permit the Parties to make legal arguments in support of their positions. At the hearing, which was held on November 14, 1995, Plaintiff's counsel explained that he had only recently learned that Debtor had a new job and requested permission to take an additional deposition of the Debtor. This request was granted (Doc. No. 26), and, on December 7, 1995, the Plaintiff took additional testimony from the Debtor. Transcripts of the Debtor's original deposition testimony, his testimony at trial and the later deposition testimony are filed as part of the trial record. No additional evidence is needed.

**6.** For example, although Debtor claims transportation/car repair expense at $250 per month, Leslie's car is brand new, and Debtor's transportation and expenses are provided by his employer. Debtor claims utilities' expenses of $600 per month, $600 per month for food for a family of three people, and laundry and dry cleaning expenses of $200 per month, all of which the Court considers excessive (Plaintiff's Exhibit 35).

longer enforceable against Debtor.[7] Further, Debtor testified that these were his expenses when his base salary was only $60,000. After the true facts were established that he has a New Salary of at least $85,000, he had gained an increase of at least $25,000 to use for other purposes. Assuming that the Debtor is in a 31% tax bracket, Debtor's additional income will total approximately $17,250 per year. As such, the Court concludes that the Debtor has net disposable income of at least $17,000 per year over and above the Debtor's necessary living expenses.

*Plaintiff's Current Financial Situation.* After the divorce, on January 14, 1994, Plaintiff formed a new subsidiary, HLS Enterprises, Inc. ("Enterprises") (Debtor's Exhibit 49) which she continues to operate. Enterprises' revenues have declined; however, and Plaintiff was forced to move the company's operation to smaller and less expensive offices. Because of this move, Plaintiff is in the process of selling the property on which Enterprises previously operated (Plaintiff's Exhibit 15). Although there is substantial equity in the property, after satisfying an existing mortgage, the balance will be paid to the Internal Revenue Service in order to satisfy personal and corporate tax liabilities. Both Enterprise and Plaintiff continue to have substantial federal and state tax liabilities.

Plaintiff has a home with a current market value of $400,000 and a mortgage of approximately $313,000. She withdrew $90,000 from an individual retirement account in 1994 and borrowed $105,790 from Enterprises (Plaintiff's Exhibit 8) to pay her living expenses. Plaintiff's income has declined over the past three years: from $133,950 in 1993, to $93,699 in 1994 (Plaintiff's Exhibit 12), to approximately $75,000 in 1995. Plaintiff's projected monthly living expenses for herself and her two children significantly exceed her current income (Plaintiff's Exhibit 7).

Although Plaintiff's balance sheet lists assets valued at $724,750, her liabilities associated with those assets total $721,930. These liabilities do not include substantial additional obligations for federal and state taxes, and professional fees and liabilities related to the Southern Litigation (Plaintiff's Exhibit 7). Plaintiff has demonstrated that her liabilities substantially exceed her assets and that she does not have sufficient income to pay her and her children's normal living expenses.

*Plaintiff's Allegations.* Plaintiff seeks a determination that Debtor's maintenance and support obligations for herself and the Children under the Divorce Decree are nondischargeable pursuant to Section 523(a)(5) of the Bankruptcy Code. In addition, Plaintiff seeks a judgment against Debtor for any past due support obligations. Finally, Plaintiff seeks a determination under Section 523(a)(15) of the Bankruptcy Code that debts totalling $500,910 arising from the Debtor's obligation to indemnify her for the Stewart Judgment are nondischargeable.

*Indemnification Obligations Under the Agreement.* The amounts sought by Plaintiff for the Debtor's indemnification obligations under the Agreement consist of a hodgepodge of the following items:

(i) a debt of $17,831 payable to Chemical Bank (the "Chemical Debt")[8];

(ii) attorney's fees of $7,000 for Plaintiff's current domestic relations lawyer in Texas (the "Domestic Relations Fees");

(iii) attorney's fees of $108,425 for professionals retained by the Plaintiff to defend her interests in the Stewart Litigation (the "Stewart Fees");

(iv) business and tax planning consultant's fees of $46,745 (the "Planning Fees")[9];

7. Although Debtor claims monthly payments of $750 on loans from family members totalling $33,000, at least a portion of the loans, $18,000, was borrowed pre-petition and is unenforceable in light of the Debtor's discharge and should not be used to delay or defeat payment of nondischargeable debts.

8. The Chemical Debt is founded on an action filed by Chemical Bank against Plaintiff in Texas state court for recovery on a credit card debt which, Plaintiff alleges, arises from Debtor's use of the credit card subsequent to their divorce in connection with his operation of HLS Florida (Plaintiff's Exhibit 25). No judgment has been entered against Plaintiff.

9. The Planning Fees appear to have been incurred by Plaintiff in connection with the operation of HLS, Enterprises or are related to her personal financial situation. Insufficient evidence was introduced concerning the nature of

(v) attorney's fees of $3,756 incurred in this proceeding (the "Bankruptcy Fees");

(vi) the Stewart Judgment in the amount of $276,500 [10]; and,

(vii) expenses of $52,150 incurred in connection with Enterprises' operations ("Enterprises' Expenses") [11].

Of these expenses, neither the Divorce Decree nor the Agreement require the Debtor to pay the Domestic Relations Fees, the Planning Fees, or Enterprises Expenses. Therefore, by adding the remaining items, Plaintiff is entitled to payment from Debtor under the Agreement of *no more* than $395,-000.

A large percentage of this amount has not yet been fully determined. Plaintiff's liability for the Chemical Debt and the Stewart Judgment is contingent because litigation is still pending. However, it appears imminent that substantial judgments may be assessed against the Plaintiff.

The only remaining amounts sought by Plaintiff include the Stewart Fees of $108,425 which she incurred in representing her interest in the Stewart Litigation and the Bankruptcy Fees of $3,756 which she incurred in enforcing the Agreement in connection with this adversary proceeding. The Debtor is obligated under the Agreement to pay only the "reasonable" fees and expenses incurred by the Plaintiff. The Bankruptcy Fees of $3,756 are reasonable. The Stewart Fees appear excessive and unreasonable given the relatively simple nature of the underlying contract dispute and the fact that the Debtor already has paid $25,000 in fees and costs in defending the Stewart Litigation. The Plaintiff should have expended no more than the Debtor in her defense of the Stewart Litigation. As such, fees and expenses of $25,000

are deemed reasonable and payable by the Debtor under the Agreement.

Therefore, totalling the Debtor's maximum liability under the indemnification provisions of the Agreement, Debtor currently is liable to Plaintiff for the reasonable Stewart Fees of $25,000 together with the Bankruptcy Fees of $3,756 which total $28,756. In addition, the Debtor may be liable in the future for any judgment rendered against Plaintiff on the Chemical Debt, or the Southern Litigation as well as any reasonable fees or costs incurred in defending this litigation. (Both the current and future, contingent liability of the Debtor to Plaintiff under the Agreement are referred to as the "Divorce Debts").

*Issues.* The issues in this case may be summarized as follows:

1. Whether Debtor's obligation under the Divorce Decree to contribute towards Devin's College Expenses constitutes a continuing obligation which is nondischargeable.

2. Whether Debtor's obligations to Plaintiff under the Divorce Decree are in the nature of alimony and support.

3. Whether Debtor's obligations to Plaintiff under the Divorce Decree are nondischargeable because Debtor has the ability to pay the debts or because the benefit to Debtor of a discharge of such obligations does not outweigh the detriment to Plaintiff.

### SECTION 523(a)(5)

Generally, in a challenge to the dischargeability of a debt, the burden is on the plaintiff/creditor to demonstrate by a preponderance of the evidence that the debt is within one of the specifically enumerated exceptions under Section 523(a) of the Bankruptcy Code. *Grogan v. Garner,* 498 U.S. 279, 287, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991); Fed.R.Bankr.P. 4005 (1995). Section

---

the Planning Fees or the dates on which such fees were incurred.

**10.** Based on a calculation of post-judgment interest due on the Stewart Judgment, it appears that this amount is overstated by approximately $20,-000 (Plaintiff's Exhibit 23).

**11.** The Enterprises Expenses consist of $36,000 for the replacement of gates and hiring guards

for security on Enterprises' business locations and $16,150 for expenses associated with a change to the HLS logo allegedly necessitated as a result of the deleterious effect of the Stewart Judgment. None of these expenses are reasonably related to the Stewart Litigation but are instead expenses incurred by Enterprise in its normal operations.

523(a)(5) of the Bankruptcy Code provides that a debt to a former spouse or child for "alimony to, maintenance for, or support of such spouse or child" is not dischargeable. As such, the debtor's "fresh start," typically provided by a discharge, is subordinated to the needs of the debtor's former spouse and children. *Harrell v. Sharp (In re Harrell)* 754 F.2d 902, 906 n. 6 (11th Cir.1985).

■■■ What constitutes alimony, maintenance, or support is determined under federal bankruptcy law, not state law. *Id., Shaver v. Shaver,* 736 F.2d 1314, 1316 (9th Cir.1984). A bankruptcy court should look to the substance of the agreement or order creating the obligation and disregard labels in making this determination. *Campbell v. Campbell (In re Campbell),* 74 B.R. 805, 809 (Bankr. M.D.Fla.1987) (Paskay, C.J.).

■■■ In deciding whether a payment obligation is in the nature of alimony, maintenance or support, the intent of the parties and the state court at the time the obligation is imposed is determinative. *Id.; Erler v. Erler (In re Erler)* 60 B.R. 220, 223 (Bankr. W.D.Ky.1986). Although the best indication of this intent is usually contained in the written settlement agreement or final judgment, in the event that the written documents are ambiguous, extrinsic evidence is relevant to determining the intent of the parties. *Shaver,* 736 F.2d at 1316; *Cassata v. Cassata (In re Cassata),* 119 B.R. 280, 282–283 (Bankr.M.D.Fla.1990) (Proctor, J.).

■■■ However, bankruptcy courts should *not* relitigate the issues between the divorced spouses, duplicate the efforts of the state court, or alter the terms of the award due to changed circumstances. *Harrell,* 754 F.2d at 906–07. Rather, Section 523(a)(5) requires that the bankruptcy court determine nothing more than whether the payment obligation is in the "nature of alimony, maintenance, or support." *Id.* "The language does not suggest a precise inquiry into financial circumstances to determine precise levels of need of support; nor does the statutory language contemplate an ongoing assessment of need as circumstances change." *Id.* Instead, the Bankruptcy Court is limited to liquidating known amounts and leaving any issue regarding future modifications to the applicable state court.

*Agreed Nondischargeable Obligations.* In this case, Debtor agrees that his support obligations under paragraph 11 of the Divorce Decree are nondischargeable as to Jacquelyn, whether such obligations are currently due or to accrue in the future. Debtor also agrees that his past due contributions of $15,527.52 together with any additional future amounts due to the Family Trust are nondischargeable.

■■■ *Nondischargeable Obligations due to Devin.* As to Devin, the Divorce Decree clearly creates an obligation in the nature of support until Devin reaches the age of 25 as long as Devin fulfills his responsibility to maintain the required grade average. To date, Devin has not obtained the necessary "C" average. Therefore, with respect to the College Expenses, because Devin did not make the required grades beginning with his first semester, Debtor currently is only responsible under the Divorce Decree for expenses up to $5,000. This amount represents one-half of Debtor's maximum annual expense limitation of $10,000. Because Plaintiff received a tax refund in the amount of $7,326, which under the Divorce Decree is split equally between the Parties, Debtor has satisfied $3,663 of his initial obligation. The balance of $1,337 is nondischargeable. Debtor has failed to prove that he paid any portion of this liability.

As to Devin's future college expenses, the Divorce Decree intended that the costs would be borne equally between the parties, subject to an annual dollar limitation until Devin turns 25. The Debtor's future obligations for Devin's education do not permanently terminate because Devin thus far has failed to achieve the required grade. Debtor is not required, however, to continue funding Devin's failed attempts. Devin first must demonstrate he can succeed by completing one semester maintaining the requisite "C" grade average. If Devin returns to school and meets the grade requirement established in the Divorce Decree, Debtor will be responsible for one-half of Devin's expenses as outlined in the Divorce Decree until Devin reaches age 25.

Further, under Section 11.4(c) of the Divorce Decree, Debtor also is responsible for one-half of Devin's health insurance as long as Devin is "enrolled in and attending school" regardless of Devin's grades. Accordingly, Debtor may find himself paying Devin's health insurance premiums while Devin is in school but without an obligation to pay for educational expenses unless the required grades are achieved.

Therefore, as to Devin, the Debtor has continuing obligations to pay past College Expenses of $1,337, future College Expenses as provided in the Divorce Decree upon Devin completing one semester of college and earning a "C" grade average, and health insurance costs as long as Devin is enrolled in school, regardless of his grades. Each of the obligations are in the nature of support and are nondischargeable. Any future determination as to modifications or the assessment of specific amounts shall be determined by the state court in Texas.

■ *Debtor's Obligations to Plaintiff Are Not in the Nature of Alimony or Maintenance.* The entire Divorce Decree, including the Agreement, reflects an attempt by the Parties to balance income and property interests between them. The overall tenor of the Divorce Decree creates a property settlement between the Parties while establishing support obligations for the Children. All indications are that Debtor and Plaintiff were business partners and that each was equally capable of managing their respective companies following divorce. Simply stated, both received substantial income from the businesses prior to divorce which both expected to continue after the divorce. Neither party anticipated the need to support the other party or provide any future alimony or support payments. Although neither party has successfully maintained the same income level they enjoyed during their marriage, at the time of the divorce, the Parties intended to completely and permanently end all future support obligations to the other. Accordingly, any obligation of Debtor to Plaintiff under the Divorce Decree or Agreement is not in the nature of support, alimony or maintenance and is not excepted from discharge under Section 523(a)(5).

*SECTION 523(a)(15)*

Plaintiff also seeks to have the Divorce Debts deemed nondischargeable pursuant to Section 523(a)(15) of the Bankruptcy Code.[12] Section 523(a)(15) provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor ...; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor;

11 U.S.C. § 523(a)(15) (1994). Exceptions to the dischargeability of a debt are to be strictly construed in favor of the debtor. *Schweig v. Hunter (In re Hunter )*, 780 F.2d 1577, 1579 (11th Cir.1986).

*Burden of Proof.* Bankruptcy courts disagree as to who bears the burden of proof under Section 523(a)(15). The majority view allocates the initial burden to the creditor spouse to show that the spouse holds a claim "not of a kind described in (a)(5)" but that was incurred by debtor in connection with a divorce decree or separation agreement. *Collins v. Florez (In re Florez )*, 191 B.R.

---

**12.** Section 523(a)(15) was enacted pursuant to the Bankruptcy Reform Act of 1994 (the "Act") and creates an additional basis for excepting from discharge debts incurred in connection with divorce or separation in cases filed after the effective date of the Act. Pub.Law 103–394, 108 Stat. 4150, Sec. 702 (effective October 22, 1994).

112, 115 (Bankr.N.D.Ill.1995) and cases cited therein. These courts then shift the burden to the debtor to show either (a) the debtor does not have the ability to pay, or (b) the benefit to the debtor of discharge of the debt outweighs the detriment caused to the creditor spouse. *Id.*

■ This Court agrees with the majority of courts which split the burden between the parties. As is true with respect to the burden of proof concerning the discharge of student loans under Section 523(a)(8), Section 523(a)(15) creates an exception to an exception to discharge. *See, Bachner v. Illinois ex rel. Illinois Student Assist. Comm'n. (In re Bachner)*, 165 B.R. 875, 880–81 (Bankr. N.D.Ill.1994). Section 523(a)(15) makes the debt nondischargeable *unless* the requirements of sub-subsections (A) or (B) are met [13] where there exists a debt of the type described. Once the creditor demonstrates the existence of a debt which is the subject of 523(a)(15), the burden shifts to the debtor to show that he comes within one of the exceptions under (A) or (B). The debtor's burden must be carried by a preponderance of the evidence. *Hill v. Hill (In re Hill)*, 184 B.R. 750, 753 (Bankr.N.D.Ill.1995), *citing, Grogan, supra.*

Therefore, in this case, Plaintiff has the burden to show that the Divorce Debts are not in the nature of alimony, support or maintenance and that the Divorce Debts were incurred by the Debtor in the course of a divorce. As held above, none of the Debtor's obligations to Plaintiff individually are in the nature of support, alimony or maintenance. Further, the Divorce Debts arose, to the extent allowable, under the Agreement which specifically was incorporated in the Divorce Decree. As such, Plaintiff has satisfied her burden of proof that the Divorce Debts are nondischargeable. As such, the burden shifts to the Debtor to establish an exception to the determination that the Divorce Debts are nondischargeable.

*Applicable Dates for Determination.* Courts which have considered the question of the appropriate date for determining the parties' relative positions under Section 523(a)(15) agree that the date of the divorce decree is irrelevant. *Becker v. Becker (In re Becker)*, 185 B.R. 567, 570 (Bankr.W.D.Mo. 1995); *Hill,* 184 B.R. at 754 n. 13 (recognizing distinction from Section 523(a)(5) which requires consideration of factors existing upon entry of divorce decree). The relevant date for Section 523(a)(15) analyses is at or about the time of trial. *Collins v. Hesson (In re Hesson)*, 190 B.R. 229, 238 (Bankr. D.Md.1995). The Bankruptcy Court in *Hesson* recognized that Section 523(a)(15) requires:

> . . . an examination of current circumstances. For example, after the filing of the case, either party might have sustained a disabling injury or may have won the lottery, or have experienced a substantial change in earnings. Post-filing events could easily affect either debtor's ability to pay the debt or the balance between debtor's benefit from discharge and the detrimental consequences of discharge to the recipient. Use of a time substantially before the trial date could produce a silly result that mocks congressional intent.

*Id.* See also, *Woodworth v. Woodworth (In re Woodworth)*, 187 B.R. 174, 177 n. 1 (Bankr.N.D.Ohio 1995) (interpreting "income or property of the debtor" as used in Section 523(a)(15), to include exempt property and post-petition income).

■ The rationale of *Hesson* is persuasive. A bankruptcy court is a court of equity. If circumstances have changed since the petition date, whether favorably or unfavorably to either party, those circumstances should be considered. It obviously is impossible, however, for the court to anticipate future events. To the extent that support obligations are subject to changing circumstances, those future events are left to disposition by the divorce court. Therefore, to determine whether the Divorce Debts are dischargeable, the facts and circumstances

---

**13.** The Court notes, however, Section 523(c) requires the creditor spouse to file a complaint seeking to except the debt from discharge under Section 523(a)(15), whereas the exception from discharge under Section 523(a)(8) is self-executing. 11 U.S.C. § 523 (1995); S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5864.

surrounding the Parties at the time of trial, not at the Petition Date, are relevant.

*Divorce Debts are Nondischargeable to a Limited Extent.* A debtor must demonstrate one of two alternative exceptions in order to have the debt otherwise nondischargeable under Section 523(a)(15) deemed discharged. *Woodworth,* 187 B.R. at 177. The debtor must show either that he has no ability to pay the debt or that the benefit to him of discharge would greatly outweigh the harm to the former spouse.

■ A. *Ability to Pay.* Section 523(a)(15)(A) permits dischargeability of a debt where the debtor can demonstrate that he has no ability to pay the debt after taking into consideration amounts reasonably necessary for the support of debtor and his dependents. In determining whether the debtor has the ability to pay a debt of the type described in Section 523(a)(15), some courts have applied the "undue hardship" test applicable to student loans under Section 523(a)(8). *Florio v. Florio (In re Florio ),* 187 B.R. 654, 657 (Bankr.W.D.Mo.1995). Undue hardship is a factual question requiring consideration of all of the debtor's facts and circumstances. *Andrews v. South Dakota Student Loan Assist. Corp. (In re Andrews ),* 661 F.2d 702, 704 (8th Cir.1981), *citing, In re Wegfehrt,* 10 B.R. 826, 830 (Bankr.N.D.Ohio 1981). The basis of undue hardship must be long-term in order for the debt to be nondischargeable under Section 523(a)(8), *Georgia Higher Educ. Assist. Corp. v. Bowen (In re Bowen ),* 37 B.R. 171, 172–73 (Bankr.M.D.Fla.1984) (Proctor, J.), and requires that the debtor show that his financial resources permit him only a poverty-level standard of living if the loan is not discharged. *Cadle Co. v. Webb (In re Webb ),* 132 B.R. 199, 202 (Bankr.M.D.Fla.1991) (Proctor, J.).

■ Other courts have adopted the "disposable income" test of Section 1325(b) which permits confirmation of a Chapter 13 plan over creditor objections where all of the debtor's projected disposable income is used to fund the plan payments. 11 U.S.C. § 1325 (1995). Indeed, the language of Section 523(a)(15)(A) "mirrors" that of Section 1325(b)(2). *Hill,* 184 B.R. at 755. The dis-

posable income test "focuses on whether the debtor's budgeted expenses are reasonably necessary." *Id.* While courts are reluctant to substitute their own judgment for that of the debtor concerning lifestyle choices, debtors are not permitted to incur expenses for luxury items in order to "manufacture" an inability to pay. *Id.*

■ This Court agrees that the disposable income test is appropriate for consideration under Section 523(a)(15). Not only is the express statutory language similar to that contained in Section 1325(b), there is no indication that Congress intended that debtors be required to show that nondischargeability produce an undue hardship to the debtor.

The legislative history of Section 523(a)(15) supports a holding that Congress did not intend to force debtors with obligations under domestic property settlements into a poverty state but instead intended to require these debtors to pay obligations to former spouses under property settlement agreements if they could also pay the normal and reasonable everyday living expenses for themselves and their new families. The legislative history provides:

> Subsection (e) adds a new exception to discharge for some debts arising out of a divorce decree or separation agreement that are not in the nature of alimony, maintenance or support. In some instances, divorcing spouses have agreed to make payments of marital debts, holding the other spouse harmless from those debts, in exchange for a reduction in alimony payments. In other cases, spouses have agreed to lower alimony based on a larger property settlement. If such "hold harmless" and property settlement obligations are not found to be in the nature of alimony, maintenance, or support, they are dischargeable under current law. The nondebtor spouse may be saddled with substantial debt and little or no alimony or support. This subsection will make such obligations nondischargeable in cases where the debtor has the ability to pay them and the detriment to the nondebtor spouse from their nonpayment outweighs

the benefit to the debtor of discharging such debts. In other words, the debt will remain dischargeable if paying the debt would reduce the debtor's income below that necessary for the support of the debtor and the debtor's dependents. The Committee believes that payment of support needs must take precedence over property settlement debts. The debt will also be discharged if the benefit to the debtor of discharging it outweighs the harm to the obligee. For example, if a nondebtor spouse would suffer little detriment from the debtor's nonpayment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the nondebtor spouse or because the nondebtor spouse could easily pay it) the obligation would be discharged. The benefits of the debtor's discharge should be sacrificed only if there would be substantial detriment to the nondebtor spouse that outweighs the debtor's need for a fresh start.

H.R.Rep. No. 835, 103d Cong., 2d Sess. (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340.

■ Under Section 523(a)(15)(A), income of the debtor's current spouse is irrelevant to debtor's ability to pay. *Carter v. Carter (In re Carter)*, 189 B.R. 521, 522 (Bankr. M.D.Fla.1995) (Proctor, J.). However, the current spouse's income may be considered in relation to any reasonably necessary expenses incurred for debtor's own support— particularly those incurred jointly or since the date of the marriage.

Prior to trial, Debtor had an income of $60,000. Although the Debtor testified otherwise, a reasonable review of the Debtor's current expenses indicates that he had sufficient income, together with Leslie's income,[14] to pay their reasonable and necessary living expenses. After reviewing the Debtor's demeanor and considering his lack of candor, the Court concludes that the expenses he introduced to demonstrate his poor financial

situation were inflated to demonstrate a lack of disposable income. It simply makes no logical sense that Debtor could obtain a mortgage of almost $200,000 in August, 1995, shortly before trial, at a time in which he could not pay his living expenses.

Debtor's New Salary provides him additional disposable income of more than $17,000 per year. Debtor does not need this additional income to pay his normal living expenses but can use these funds to satisfy his obligations under the Divorce Decree and Agreement. Accordingly, Debtor has failed to sustain his burden of showing that he does not have the ability to pay the Divorce Debts, albeit over an extended time.

■ B. *Balancing Test.* Section 523(a)(15)(B) sets forth a balancing test requiring the debtor to show that the benefit to the debtor of discharging the debt outweighs the detrimental consequences of discharge to the creditor spouse. This analysis requires the court to evaluate the lifestyles of the parties and make value judgments concerning what is "fair." *Phillips v. Phillips (In re Phillips)*, 187 B.R. 363, 369 (Bankr.M.D.Fla. 1995) (Proctor, J.). This balancing test considers "not which party is in the better position to pay the debt ... [but] whether the benefit to the [d]ebtor outweighs the harm to [the creditor spouse]." *Anthony v. Anthony (In re Anthony)*, 190 B.R. 429, 433 (Bankr. N.D.Ala.1995). This subsection, therefore, creates an "illusive statutory standard" requiring an objective weighing of a perceived subjective benefit of discharge against possible adverse circumstances accruing to the creditor spouse. *Hill*, 184 B.R. at 756.

■ Balancing these interests requires a review of the totality of circumstances in comparing the financial situation of both parties and considering any other relevant subjective factors. *Carroll v. Carroll (In re Carroll)*, 187 B.R. 197, 201 (Bankr.S.D.Ohio 1995). The court in essence determines the "relative impact of discharg-

---

**14.** Although Leslie's income is not considered for purposes of determining Debtor's ability to pay his own expenses, the Court does not ignore Leslie's income contribution for those obligations for which she is directly liable (e.g., mortgage and automobile) and her joint support obligation for her family.

ing the obligation." *Id.* Factors to be considered in making the determination include:

1. income and expenses of both parties;
2. whether the nondebtor spouse is jointly liable on the debts;
3. the number of dependents;
4. the nature of the debts;
5. the reaffirmation of any debts;
6. the nondebtor spouse's ability to pay.

*Hill,* 184 B.R. at 756.

In this case, Debtor has income of $17,000 per year above that necessary to pay his and his family's reasonable living expenses. Plaintiff has no excess income and cannot pay her ongoing living expenses. Both Parties have dependents. Most significantly, the Divorce Debts are solely attributable to the Debtor's businesses he ran in Florida; yet, the Plaintiff is at least contingently liable for these debts which were incurred by her former husband. Plaintiff has no excess funds to pay these debts. Further, Plaintiff continues to operate her own business, Enterprises, which, if seized in collection actions, would deprive her of her only source of future income. In short, forced collection of the Divorce Debts could result in Plaintiff losing her business and livelihood.

Debtor argues that the Plaintiff can avoid this consequence by simply filing her own individual bankruptcy case. Some courts apparently suggest that a subsequent discharge in bankruptcy by the creditor spouse is an appropriate consideration. *See, Hill,* 184 B.R. at 756; and *Hesson,* 190 B.R. at 240 (relying on *Hill* analysis and suggesting that plaintiff could have filed bankruptcy in order to avoid liquidating exempt assets to pay joint debt). In essence, these courts urge creditor spouses to file bankruptcy. Such analyses cavalierly ignore questions of whether the creditor spouse is eligible to file a bankruptcy case or is entitled to receive a discharge under Section 727 or discharge debts under Section 523 of the Bankruptcy Code. In addition, many individuals today continue to consider bankruptcy an antithetical solution to oppressive debt, and courts should not be in the business of forcing innocent parties into bankruptcy because they regard that as the lesser evil under Section 523(a)(15). Neither should one spouse be able to force a non-filing creditor spouse into bankruptcy by using the exception contained in Section 523(a)(15) of the Bankruptcy Code.

Rather, the balancing test set forth in Section 523(a)(15)(B) requires a court to examine the harm and benefits caused to the parties in their existing situations. The fact that the non-filing creditor spouse may later file bankruptcy is not a relevant factor in weighing the relative impact to the respective parties.[15] If a debtor spouse has disposable excess income, the non-filing creditor spouse has no excess income and no ability to pay joint liabilities which the debtor agreed to pay, the harm to the creditor spouse generally will outweigh the harm to the debtor.

In weighing the equities in this case to determine what is fair, the benefit of the Debtor's discharge would allow him to retain excess income of over $17,000 per year. Certainly, the Debtor would receive a substantial benefit if his obligation for the Divorce Debts were discharged. However, this benefit is greatly outweighed by the harm the Plaintiff would suffer. She has no funds to pay these debts and forced collection actions would result in the loss of her business and only income. Therefore, by applying the balancing test of Section 523(a)(15)(B), Debtor, who bears the burden of proof, has failed to show that the discharge of the Divorce Debts would result in a benefit to the Debtor that outweighs the detrimental consequences to the Plaintiff.

At this time, however, the liquidated Divorce Debts only consist of the reasonable Stewart Fees and the Bankruptcy Fees which total $28,726. Clearly, the Debtor has sufficient funds to pay these amounts in a reasonable period of time in light of the fact that he has excess disposable income of over $17,000 per year not including any anticipat-

---

**15.** To the extent, however, that the creditor spouse in fact discharges debts in a subsequent bankruptcy case, the debtor spouse should be relieved of any liability to the creditor spouse for those debts.

ed bonuses he will receive. However, Plaintiff's liability may increase substantially upon the resolution of the Southern Litigation and the litigation involving the Chemical Debt. If these judgments exceed the anticipated amount of $200,000, the Debtor could not pay the full amount in a reasonable period of time. Therefore, it is proper to make only a portion of the contingent liability nondischargeable.

Allocating a portion of the contingent liabilities as nondischargeable is consistent with the Congressional expression of the intended application of Section 523(a)(15). The balancing test set forth in Section 523(a)(15)(B) requires a weighing of the equities between the parties in order to fashion a remedy fair to both parties. This balancing test is completely distinct from the first exception which only addresses a debtor's ability to pay. If the debtor has no excess income, the balancing test is never reached. *Woodworth*, 187 B.R. at 177. However, if, as in this case, the debtor does have excess disposable income, then the equitable balancing test permits a court to make a portion of the debt in question dischargeable and the remainder nondischargeable.

In this case, the Debtor has excess income of approximately $17,000 per year. By utilizing these excess funds over a ten-year period to pay the Divorce Debts, he could contribute $170,000 to reduce the Plaintiff's obligations for the Divorce Debts. Therefore, it would be appropriate to make the Divorce Debts nondischargeable up to the maximum amount of $170,000 and to make the remainder dischargeable. At this time, only $28,756 represents a known liability. However, in the event that the Plaintiff is assessed judgments in the Southern Litigation or in connection with the Chemical Debt or incurs reasonable attorney's fees in defending her interests in such litigation, Debtor also is liable to pay an additional amount of $143,244 which shall be deemed nondischargeable. Any amounts in excess of $143,244 ultimately awarded against Plaintiff shall be deemed discharged.

Provided, however, to the extent the Plaintiff is not held liable for these debts or to the extent such debts later are discharged in a bankruptcy filed by Plaintiff or otherwise forgiven, the Debtor's liability also will end, and he will be relieved of any future payment obligations. Certainly, Debtor should not have to pay debts for which the Plaintiff herself is no longer liable.

*Summary.* In accordance with the stipulation of the Parties, Debtor's support obligations for Jacquelyn under Section 11 of the Divorce Decree are excepted from discharge. In addition, as stipulated, Debtor's obligations with respect to funding the Family Trust are nondischargeable, including $15,528 for past due amounts. Debtor's obligations under the Divorce Decree to contribute to Devin's post-secondary education are nondischargeable, but only in the amount of $1,337 for past due obligations. With respect to future expenses Debtor's responsibility is nondischargeable but only enforceable after Devin attains the requisite grade average for one semester as required under the Divorce Decree.

The Divorce Debts, as defined earlier in this opinion, in a total amount not to exceed $170,000, including both current and contingent liabilities also are nondischargeable. To the extent that the Plaintiff is not liable for these debts or to the extent that such debts are later discharged in bankruptcy or otherwise forgiven, the Debtor's liability also will terminate and he shall be relieved of any future payment obligations. Further, to the extent that such debts exceed $170,000 *in toto,* the debts are discharged.